UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Dominique N. Brown,

    Plaintiff,

v.      No. 16 CV 50389
     Magistrate Judge Iain D. Johnston

Nancy A. Berryhill, Acting
Commissioner of Social Security,[1]

    Defendant.

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal. Since she was a young girl, plaintiff Dominique Brown has suffered from seizures and diabetes. Eventually, with medication, she was able to bring her seizures under control, but the diabetes has remained—in the medical parlance—"uncontrolled." Why this is so is a key issue in this case. Plaintiff dropped out of school in the tenth grade when she became pregnant with her daughter. In her relatively brief adult life, she has worked as a child care worker, a fast food cashier, and a factory worker, but has not been able to sustain employment at these or any other jobs. In December 2012, she filed for disability benefits claiming that she could not work full-time primarily because of complications from her diabetes and also because she was obese.[2] From roughly 2009 until 2014, plaintiff was treated fairly regularly by her primary care physician, Dr. Christopher Jelinek.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] At the time of the administrative hearing, in December 2014, plaintiff weighed 246 pounds and was five feet four inches tall. R. 62. She was 28 years old, single, living with both her 11-year-old daughter and her mother who had recently moved back from North Carolina and who was providing plaintiff some financial support. R. 48-50.

During this time, she also was taken to the emergency room a number of times with various problems, many of them ostensibly related to her uncontrolled diabetes.[3]

In a written decision, the administrative law judge ("ALJ") concluded that plaintiff had the residual functional capacity ("RFC") to do light work, meaning that she could (among other things) stand or walk for six hours in a normal workday and could frequently lift 10 pounds and occasionally lift 20 pounds. The ALJ's RFC analysis was not based on any formal medical opinion. There was no consultative examination ordered, and the ALJ chose not to call an impartial expert at the hearing. No medical questionnaires were completed by a treating physician. Although there were several agency opinions, they were largely ignored by the ALJ and, in any event, are devoid of any meaningful analysis.[4]

Although there was no formal medical opinion, the ALJ relied heavily on the treatment notes from Dr. Jelinek. In the narrative portion of the decision, the ALJ summarized statements from Dr. Jelinek advising plaintiff to exercise more, to lose weight, to check her blood sugars more regularly, to stop smoking, and to not miss any doctor appointments. The ALJ further noted that Dr. Jelinek suggested that, if plaintiff were compliant with these recommendations, her symptoms would improve. This non-compliance rationale appears to be the ALJ's primary rationale. The ALJ also found that plaintiff lacked credibility because she made several allegedly inconsistent statements about her medical treatment and about a one-month stint working a factory-type job in the summer of 2013.

---

[3] *See, e.g.*, R. 29 ("On April 22, 2012, she was brought by the Fire department, due to diabetic symptoms. The claimant was foaming at the mouth."); R. 30 ("On January 17, 2014, the claimant arrived at Freeport Memorial Hospital (FMH) via ambulance, due to severe lower leg pain.").

[4] Specifically, Dr. Francis Vincent opined that plaintiff could do medium work. Ex. 6A. In the decision, the ALJ did not accept Dr. Vincent's opinion because the ALJ concluded that he failed to consider all of plaintiff's impairments including specifically her obesity. R. 36. Although the ALJ ambiguously stated that she was giving Dr. Vincent's opinion "some weight," the analysis suggests that she rejected it entirely. It should be noted that Dr. Vincent found that plaintiff had few restrictions and could, for example, do unlimited kneeling, crouching, balancing, and climbing of ramps and stairs and could do occasional climbing of ladders, ropes, and scaffolds. R. 106.

In this appeal, plaintiff raises several criticisms directed at these big-picture rationales, which the Court will discuss at the end of this opinion. However, plaintiff's first and primary argument for remand is more fine-grained. Relying on SSR 96-8p and related Seventh Circuit case law, plaintiff argues that the ALJ failed to provide a "function by function assessment"—specifically, the ALJ did not explain (among other things) why plaintiff could stand or walk six hours and lift 10 pounds up to two-thirds of the workday. The Government argues that SSR 96-8p only requires the ALJ to "narratively discuss" plaintiff's limitations and that the ALJ did so here in the narrative discussion where the ALJ found, according to the Government, that the objective evidence did not support plaintiff's allegations and that plaintiff had admitted to a doctor that she was doing "normal activities." Dkt. #15 at 4. The Court is not persuaded by the Government's argument.

SSR 96-8p requires the ALJ to engage in a function-by-function assessment of the claimant's specific limitations. *See* SSR 96-8p ("a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions"). And the Seventh Circuit has repeatedly remanded where the ALJ failed to consider individual limitations. *See Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014) ("No doctor conducted a functional assessment, which includes a function-by-function assessment of Murphy's capability to perform light work"); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ "did not identify any medical evidence to substantiate her belief" that plaintiff "can stand for 6 hours or lift up to 20 pounds").

Here, the ALJ provided the following one-paragraph analysis at the end of the decision:

> On functional limitations, the claimant gave conflicting information at the hearing. She testified that she cannot lift a basket, but then said she can lift a gallon of milk. She said she fell down the stairs three times and last fell three weeks ago, but testified that she does not use a cane. She testified that she can sit 20 minutes and

> stand 20 minutes, but during her office visit with Dr. Jelinek on November 12, 2014, she stated that she was doing her normal activities (Exhibit 9F/ 13). Additionally, during that visit, the treating source saw the claimant carrying a baby carrier with the baby (Exhibit 9F/ 13), which the undersigned notes that they should weigh at least 20 pounds. The claimant refers to Exhibit 4F/11 regarding elevating the legs, but in fact, the undersigned notes that the exhibit states, "We discussed that she makes sure she keeps her legs elevated as much as possible <u>after work</u>."

R. 35 (emphasis added by the ALJ). The reference to "functional limitations" suggests that this was the ALJ's attempt to provide a functional analysis. In their briefs, the parties overlooked this paragraph. The Court finds that it is the obvious starting point for the analysis.

Although this paragraph does address functional limitations, it is inadequate because there are too many unanswered questions and strained inferences. The paragraph contains five assertions. First, as for the ALJ's claim that plaintiff stated at the hearing that she could not lift a basket but could lift a gallon of milk, it is not clear that these answers were inconsistent. For one thing, it is not known what plaintiff meant when she volunteered that she could not lift a basket. What kind of basket? Was it empty or something like a laundry basket filled with clothes? So it is not even clear that the basket weighed less than the gallon of milk, as the ALJ assumed. Another factor not considered is plaintiff's testimony that her lifting abilities varied with her fluctuating pain levels. When asked whether she could lift ten pounds, plaintiff stated that "it depends [] if I'm in pain." R. 61. Finally, and most importantly, this testimony does not address plaintiff's main argument, which is that the ALJ cited no evidence to show that plaintiff could *repeatedly* lift ten pounds over the course of a workday. The Seventh Circuit has criticized reliance on one-time events when evaluating a claimant's ability to sustain work over longer periods. *See, e.g., Thomas v. Colvin*, 534 Fed. Appx. 546, 551 (7th Cir. 2013) ("We have previously concluded, under nearly identical facts, that walking for 50 feet without a cane—a

4

'brief excursion'—does not demonstrate an ability to stand for 6 hours."). In sum, this first alleged contradiction is a weak ground to support the finding about frequent lifting.[5]

Second, the ALJ found it inconsistent that plaintiff reported having fallen down her stairs three times, but then did not regularly use a cane. Here again, the Court is unclear about the precise inconsistency. Was the ALJ suggesting that plaintiff should have used a cane *while* going down the stairs? But wouldn't handrails have performed the same function? Putting this point aside, the ALJ did not confront the possibility that navigating stairs was more difficult—and thus more likely to lead to accidents—than walking on level ground.

Third, the ALJ noted that plaintiff testified that she only "can sit 20 minutes and stand 20 minutes" at a time, but then told Dr. Jelinek at a November 12, 2014 visit that "she was doing her normal activities." R. 35. The ALJ relied heavily on this one statement, referring to it several more times in the decision. As noted above, the Government also viewed this statement as one of the ALJ's two major rationales. However, the ALJ arguably took this statement out of context because plaintiff stated that she was doing "her" normal activities, but did not define what those activities were. The ALJ seemed to assume that they were those of a normal healthy person. However, at the hearing held a month later, plaintiff made it clear that *her* normal activities were very limited. *See* R. 64 ("*Normally*, I just lay in bed.") (emphasis added). The ALJ's interpretation is also undermined by other statements from the same paragraph suggesting that plaintiff was still limited by her pain. For example, Dr. Jelinek wrote that plaintiff was still reporting "severe peripheral neuropathy" and that she had "not noticed any significant improvement of her neuropathic pain" after recently starting Lyrica. R. 1027.

---

[5] Although the Court finds that this alleged contradiction is inadequate, the Court recognizes that there is other evidence in the record arguably suggesting that plaintiff could lift heavier weights. In particular, in some of her earlier jobs, she was able to lift heavier weights. *See* R. 32 ("She said that at Snack King [she] was required to lift 20-50 pound boxes and stay on her feet all the time."). But plaintiff's likely rejoinder would be that she was not able to stay with this job on a permanent basis.

5

Fourth, the ALJ noted that Dr. Jelinek made the following observation: "Patient came in carrying a baby care carrier [with] sister's newborn in it." R. 1027. The ALJ found this statement to be contradictory with plaintiff's testimony because, according to the ALJ, newborns "should weigh at least 20 pounds." R. 35. The ALJ made this baby-carrying point several other times in the decision. Although this fact at least relates to the topic of lifting abilities, it rests on a tenuous factual foundation. There is no way to know how much this particular newborn weighed because, among other things, it is not known how old the baby was. Even giving the ALJ the benefit of the doubt that the newborn weighed "at least" 20 pounds (perhaps the ALJ was adding the weight of the baby and carrier), there is still the broader issue, discussed above, about whether plaintiff could lift this weight repeatedly over a workday.

Fifth, the ALJ noted that Dr. Jelinek advised plaintiff to elevate her swollen legs only after work. The work being referred to was plaintiff's month-long factory job in 2013. (The ALJ elsewhere faulted plaintiff for allegedly not disclosing this work, and used it against her in the separate credibility analysis.) Here, the ALJ's point is more of a defensive counter-argument, noting that Dr. Jelinek only advised plaintiff to elevate her feet *after work*. The ALJ's assumption seems to be that plaintiff was able to work a full day as long as she could come home and elevate her feet at night. However, Dr. Jelinek's after-work statement may have simply been a recognition of the fact that plaintiff had told him that she had to stand for eight hours on this job. R. 860. Dr. Jelinek, therefore, may have assumed that her only opportunity to elevate her feet was after work.[6]

---

[6] Another issue debated in the briefs is the relevance of this post-onset work attempt. On the one hand, it arguably supports the ALJ's light-work RFC because, if plaintiff were able to work for a month standing for eight hours, then maybe she could work on a permanent basis if she only had to stand six hours. On the other hand, plaintiff stated that she had to quit this job because her legs were "extremely" swollen at the end of each day. R. 860.

In sum, the ALJ's five reasons in this paragraph fail to offer a logical bridge from the evidence to the specific RFC conclusions about plaintiff's standing, walking, and lifting abilities for extended periods over the workday. As the Seventh Circuit has noted, the fact that a claimant has the ability to "carry things" on some occasions does not answer the more specific questions needed for the RFC assessment. *See Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013) ("So he could lift and carry things: but what things he could lift, how large, how heavy, for how long— none of this was explored."). Here too, these questions were not explored.

Turning back to the big-picture rationales, the Court notes that the ALJ's non-compliance rationale did have some support in the record, but there are still questions that were not explored. It is true, as the ALJ noted, that Dr. Jelinek's repeatedly told plaintiff that her diabetes symptoms would improve if she would followed treatment recommendations. *See* R. 29 ("Dr. Jelinek suspect[ed] that if she lost her weight, her insulin requirement would go down significantly"). The ALJ was certainly permitted to consider whether plaintiff had complied with treatment recommendations. *See* SSR 96-7p. But a question still remains about *how much* improvement would ensure. Would it be enough, for example, to allow plaintiff to stand and walk six hours a day, five days a week? Although the doctor's statements suggested he thought plaintiff would improve, his statements are typically phrased in vague, arguably precatory, terms.[7] For example, in a recent comment on plaintiff's peripheral neuropathy, he stated the following: "I discussed with the patient that she needs better control of her diabetes and this will hopefully help her peripheral neuropathy." R. 1023. The word "hopefully" suggests that he had some doubt about just how much improvement there would be. *See Eakin v. Astrue*, 432 Fed. Appx. 607, 613 (7th

---

[7] *See* R. 813-14 ("I *suspect* that if she loses her weight, her insulin usage will go down significantly.") (emphasis added); R. 30 (plaintiff needed to get "her sugars under good control" to prevent "*increasing* symptoms of neuropathy") (emphasis added); R. 30 ("She did have pain in her feet, which the doctor has felt was *most likely* secondary to diabetic neuropathy.") (emphasis added).

7

Cir. 2011) ("An ALJ can base an adverse credibility ruling on an applicant's failure to follow prescribed treatment if the treatment is 'clearly expected' to restore her capacity to work.").[8] For these reasons, the Court finds that the ALJ, on remand, should get an updated opinion from Dr. Jelinek to clarify his prognosis.

Another unexplored aspect of the non-compliance rationale is that Dr. Jelinek also noted at various points that plaintiff had taken some steps to comply. *See* R. 1035 ("Patient has a history of poorly-controlled diabetes. She states that her sugars have been running in the 200's this week. Patient does try to check her sugars 4 time[s] per day and seems to be more compliant."); R. 813 ("We are quite happy that she has lost some weight, but she needs to go further on this"). However, the ALJ's narrative leaves out this contrary line of evidence. Moreover, on the specific issue of losing weight, the ALJ did not give any consideration to the fact that plaintiff was taking pain medications that may have had the side effect of causing weight gain. *See* R. 1022 ("Patient was on gabapentin for treatment of her peripheral neuropathy[;] however this was discontinued when patient complained of lower extremity edema and weight gain.").

One final observation on the non-compliance rationale. Although the discussion above focused on the ALJ's analysis, the Court notes that plaintiff has also offered a general counter-argument about her inability comply. She states that she "was a single parent with limited financial resources, no driver's license, and a 10th grade education." Dkt. #14 at 16. The premise seems to be that a person in her life situation could not realistically follow well-accepted diabetes

---

[8] As for the recommendation to quit smoking, plaintiff correctly notes that there was no evidence in the record to suggest that this would have led to significant improvement in her problems such as feet swelling and muscle cramps. The Seventh Circuit has cautioned ALJs about relying on this type of argument. *See Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985) (holding that it was "improper for the ALJ to make his own determination regarding the prognosis of recovery should Mrs. Rousey stop smoking, when the record was devoid of any evidence that she could return to work if she quit smoking").

treatment recommendations. But plaintiff has not cited to any case law, or medical evidence, to support such a broad proposition, and Dr. Jelinek's recommendations reflect an assumption that she was capable of complying. On remand, the ALJ (and plaintiff's counsel) should further explore any barriers plaintiff may have had in following treatment recommendations.

Turning to another broader rationale, the Government believes that the ALJ relied heavily on the fact that plaintiff had "mostly normal" physical examinations "between 2010 and 2014." Dkt. #15 at 5. It is not clear how explicitly the ALJ relied on this rationale, although there were many references in the ALJ's narrative to normal findings. To the extent that the ALJ relied on this rationale, two related concerns arise. First, Social Security Regulation 96-7p(4) provides that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."[9] Accordingly, there is a concern that the ALJ may have violated this principle. Second, as noted above, the ALJ did not rely on any medical opinion. This means that the ALJ's interpretation of the meaning of the normal findings, and how they related to plaintiff's specific symptoms, was a layperson analysis. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs should "rely on expert opinions instead of determining the significance of particular medical findings themselves").

Having found that a remand is warranted based on the above arguments, this Court need not address any remaining arguments. On remand, the ALJ should fully explore all these issues and should obtain a formal medical opinion from Dr. Jelinek and also should, if appropriate, call an impartial medical expert or otherwise develop the record to address these questions. *See* HALLEX I-2-5-34A.1. However, in remanding this case, this Court is not indicating a particular

---

[9] *See generally Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain").

result on remand. More pointedly, the Court finds that the ALJ's inconsistent treatment rationale is a valid and even persuasive rationale. Plaintiff is a young adult who potentially has many more productive work years ahead of her if she consistently follows her doctor's recommendations. Therefore, if the ALJ fully considers the above issues and specifically conducts an adequate function-by-function assessment on remand, then sole procedural basis for remand would be cured.

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: April 2, 2018   By: _____
Iain D. Johnston
United States Magistrate Judge